IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PETER DENIL and
GERALD NARDELLA,                                    OPINION and ORDER
                              Plaintiffs,
                                                           09-cv-470-bbc

        v.

deBOER, INC., deBOER TRANSPORTATION INC.,
deBOER CAPITAL ASSOCIATES INC. and
RONALD DeBOER,
                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        In this civil action for monetary relief, plaintiffs Peter Denil and Gerald Nardella

contend that defendants deBoer, Inc., deBoer Transportation Inc. and deBoer Capital

Associates Inc. breached stock purchase agreements between the parties and breached the

covenant of good faith and fair dealing.  In addition, plaintiffs contend that defendant

Ronald DeBoer intentionally interfered with the performance of their employment

agreements and that defendant deBoer, Inc. breached plaintiff's employment agreements.

The corporate defendants have filed two counterclaims against plaintiffs for breach of the

stock purchase agreement and breach of the covenant of good faith and fair dealing.

        Now before the court are the parties' cross motions for summary judgment, dkt.

1

##32, 28.  Defendants have moved for summary judgment on all of plaintiffs' claims against them and plaintiffs have moved for partial summary judgment on three of their claims, as well as both of defendants' counterclaims.  Also before the court is defendants' motion to exclude plaintiffs' expert witness from testifying at trial, dkt. #82.  This court has jurisdiction under 28 U.S.C. § 1332 because there is more than $75,000 in controversy and diversity of citizenship exists between plaintiffs and defendants.

With respect to plaintiffs' claims against defendants, the undisputed facts show that defendants did not breach the stock purchase agreement, violate the duty of good faith and fair dealing or breach the employment agreements.  Also, the evidence establishes that defendant Ronald DeBoer did not tortiously interfere with plaintiffs' employment contracts. Because there are no genuine factual disputes and defendants are entitled to judgment as a matter of law on these claims, I will grant defendants' motion for summary judgment in full and will deny plaintiffs' motion with respect to those claims.  With respect to defendants' counterclaims, the undisputed facts show that plaintiffs did not breach the stock purchase agreement or violate the duty of good faith and fair dealing.  Therefore, I will grant plaintiffs' motion for summary judgment with respect to defendants' counterclaims.  Finally, because this order disposes of all of the claims in this case, I will deny as unnecessary defendants' motion to exclude expert witness testimony.

From the parties' proposed findings of fact, I find the following facts to be material

2

and undisputed.

## UNDISPUTED FACTS

### A. The Parties

Plaintiffs Peter Denil and Gerald Nardella are citizens and residents of Illinois. Defendants deBoer Inc., deBoer Transportation Inc. and deBoer Capital are Wisconsin corporations involved in the trucking business, with their principal places of business in Wisconsin.  Defendant Ronald DeBoer is a citizen and resident of Wisconsin.  He is the founder of deBoer, Inc. and deBoer Capital Associates, Inc., and has been the chairman of the board of directors for both companies since their incorporation.

### B. Plaintiffs' September 5, 2008 Proposal to the deBoer Companies

Plaintiffs Denil and Nardella first met defendant Ronald DeBoer sometime in 2007 or 2008 during a negotiation to sell deBoer, Inc. to an outside corporate buyer.  The deal with the outside buyer failed, but plaintiffs remained interested in investing in the deBoer companies.  During the summer of 2008, after several communications and discussions with Ronald DeBoer, plaintiffs proposed that they acquire an ownership interest in deBoer, Inc. and become managers of the deBoer companies.  Ronald DeBoer solicited a formal proposal from plaintiffs for the purchase of a minority interest in the deBoer companies.

On September 5, 2008, plaintiffs emailed Ronald DeBoer a document titled "Proposal for Management Change and Investment in: De Bore [sic] Transportaion Inc., DeBoer Inc., DeBoer Capital Inc., By Pete Denil, Jerry Nardella."  Under the proposal, plaintiffs would invest a total of $750,000 in the deBoer corporations, become part of the management team, transform the corporations into asset-light organizations, increase profitability and sell the companies in approximately five years.

In the proposal, plaintiffs discussed how proceeds from a future sale of the deBoer companies would be distributed, stating that in the event of a sale, all shareholders would receive the value of their shares plus an increase at a compounded rate of eight percent.  If there was any residual, 75% of the residual would be prorated among all shareholders, while the remaining 25% would be distributed "between select members of the management team." The proposal contained a chart relating to the distribution of proceeds from a sale of the deBoer companies, which stated that 25% of the residual net proceeds from a sale of the deBoer companies would be distributed to the "Management Team."  A footnote appearing at the bottom of the chart stated in another section that the "[m]anagement team would be Pete [Denil], Jerry [Nardella] and other key managers yet to be defined."  The proposal did not identify how those members of the management team would be chosen, but stated that plaintiffs "[c]urrently . . . would anticipate that the management team would consist of Pete [Denil], Jerry [Nardella], Dale [DeBoer], Doug [Vogel], Dave [Anderson], Roger [Placzek],

4

Kay [DeBoer] and possibly the director of Safety." Besides plaintiffs, these individuals were all managers of deBoer, Inc., deBoer Transportation, Inc. or deBoer Capital Associates, Inc. as of September 5, 2008.

> Plaintiffs also discussed valuation of the deBoer companies, providing as follows:

> We can discuss the best way to value an organization but the industry has been paying more for companies with an asset-light or non-asset foot print than a pure-asset based transportation provider. . . . When we are ready to sell the company we hope to find a strategic buyer from the trucking industry who will place specific values on equipment, customers, drivers, non asset business etc. But for example purposes, because it is simple and easy to calculate I will use the financial industries tool which is a multiple of EBITDA. . . .

"EBITDA" is an acronym for the valuation method that calculates "earnings before income, taxes, depreciation and amortization."

> With respect to the management of the company, plaintiffs stated that "operating parameters would be established identifying the magnitude of decisions that must be brought before the Board of Directors and the daily decisions and management of the organization which would be the exclusive domain of the CEO provided the company is reaching minimal key operating results." Plaintiffs also stated that shareholders would "get a minimum return on their investment before anything is shared with the new management."

> After defendant Ronald DeBoer reviewed the proposal, he and his lawyer, Francis Podvin, met with plaintiffs at Podvin's office to inform plaintiffs that they accepted it. The parties decided that they would need three separate agreements to effectuate the proposal,

5

namely, a stock purchase agreement, a buy-sell agreement and employment agreements. Representing defendants and negotiating on their behalf, Podvin provided a first draft of the "buy-sell" agreement. After attempting to negotiate outstanding issues, the parties decided that they would execute the employment agreements and stock purchase agreement, but would postpone signing a buy-sell agreement. On October 27, 2008, the parties signed plaintiffs' employment agreements and a stock purchase agreement.

## C.  Employment Agreements

Plaintiff Denil's agreement stated that he was the chief executive officer and president of deBoer, Inc. and that deBoer, Inc. would pay him $200,000 a year, among other benefits. Plaintiff Nardella's agreement made him the executive vice president of operations of deBoer, Inc. with a salary of $150,000 per year. Both employment agreements provided that plaintiffs would receive certain benefits if they were terminated "without cause" by defendant deBoer, Inc., as well as payments to which they would be entitled if their employment was terminated for "cause," death, disability or if plaintiffs terminated their own employment. deBoer, Inc. had the right to terminate plaintiffs "with cause" if they "fail[ed] to purchase stock pursuant to [the] Stock Purchase Agreement."

6

D. <u>Stock Purchase Agreement</u>

On October 27, 2008, plaintiffs and the deBoer companies executed a stock purchase agreement, which provided that, subject to certain conditions, plaintiffs would pay up to $750,000 to purchase a maximum of 6% of the deBoer companies' capital stock, equal to a maximum of 6% of each company's voting ownership interest.  Plaintiff Denil was to pay $500,000 and plaintiff Nardella would pay $250,000.  The stock purchase agreement set the closing date for plaintiffs' stock purchase as April 15, 2009, or an earlier date if the parties had complied with the conditions set forth in the agreement.

Article VI of the stock purchase agreement addressed the conditions precedent to the accrual of plaintiffs' obligations under the agreement.  Among other things, Article VI required that plaintiffs had received a "stock buy-sell agreement and redemption" before their obligations attached.  The agreement was to contain

> a mutually agreeable formula to determine a fair market price for stock purchases and distributes proceeds from [defendant] Corporation[s'] sale to an outside third party in the manner proposed by [Plaintiffs] in their September 5, 2008 proposal with Sellers.

Dkt. #41-13, § 6.05(c).  Section 5.02 of the stock purchase agreement obligated all parties to the agreement to use their "best efforts" to cause fulfillment of the conditions precedent to the obligations of plaintiffs.

E.  Negotiation of the Stock Buy-Sell Agreement

On October 17, 2008, before the parties had entered into the employment agreements or the stock purchase agreement, Francis Podvin provided the first draft of the buy-sell agreement to defendant Ronald DeBoer, plaintiffs and plaintiff's lawyer, Gerald Condon. Condon was authorized to negotiate on plaintiffs' behalf and Ronald DeBoer was authorized by defendant companies, as well as their stockholders, to negotiate the buy-sell agreement with plaintiffs.  However, Ronald DeBoer did not participate in the initial drafting of the buy-sell agreement because he expected that Podvin and Condon would work through the initial drafts and involve him in discussion of any key disputed terms.  The first draft included a valuation method using an EBITDA multiple, similar to what had been used in plaintiff's proposal, but did not include any provisions concerning the management incentive structure and distribution of proceeds among shareholders and management.

On January 14, 2009, Podvin produced a second draft of the buy-sell agreement that was sent to defendant Ronald DeBoer, plaintiff Denil, Condon and others.  The second draft included an EBIDTA multiple valuation.  However, plaintiff Denil objected to the draft because it did not include a provision for distribution of proceeds from a sale of the deBoer companies.  Plaintiff  Denil requested that Podvin revise the agreement to conform to the proposal.  In an email to Podvin on January 23, 2009, Denil stated that "[i]n our September 5th proposal for Management Change and Investment we outlined a management incentive

8

structure regarding the sale of the company" and that "[w]e will need to incorporate this into the agreement."

On January 30, 2009, Podvin sent a third draft of the buy-sell agreement to defendant Ronald DeBoer, plaintiff Denil and Condon.  In this draft, Podvin added provisions describing the distribution of proceeds following a sale of the deBoer companies, including the management incentive structure that distributed 25% of any residual proceeds to the management team.  The draft stated that the management team receiving the proceeds consisted of Ronald DeBoer, Dale DeBoer, Kay DeBoer, Cynthia Vogel and plaintiffs.  (This list included the deBoer companies' current management team, plus plaintiffs.)  In addition, Podvin changed the provision regarding the valuation of the companies' stock for certain future sales, removing the EBITDA-based valuation method he had in the previous two drafts and replacing it with a provision providing that the purchase price of the company would be established through appraisal of the corporations' assets.

Plaintiffs agreed to the change in the method of valuation, understanding that it reflected defendant Ronald DeBoer's concern about using an EBITDA calculation for determining the value of the deBoer companies and believing that the change was reasonable.  However, plaintiffs objected to the language in the third draft that divided 25% of the residual profits from a future sale among specific, named management.  On January 30, 2009, plaintiff Denil and Podvin exchanged emails regarding the provision.  Denil told

9

Podvin that he "ha[d] the right idea, but that Denil's "proposal was that the management team under this incentive package would be [plaintiff Nardella] and [himself]." Podvin responded that the September 5 proposal referred to plaintiffs as well as "key managers to be defined." Denil insisted that he have the sole authority to determine whether other managers would share in the 25% residual proceeds and to choose who those managers might be.

On February 9, 2009, Condon sent a revised draft of the buy-sell agreement to his client, plaintiff Denil. Condon's draft provided that 25% of the residual net proceeds from a sale of the deBoer companies would be divided "among the management shareholders consisting of [plaintiffs] and such other members of the management team selected by the Board of Directors of the Corporations." Denil objected to this language, telling Condon that as the chief executive officer, Denil, not the board of directors, would have the authority to determine which management received residual proceeds.

On February 11, 2009, plaintiff Denil emailed Condon a revised version of the draft buy-sell agreement, noting that he had changed the draft "to reflect that [he] had always controlled the distribution of the 25%." Thus, the draft stated that 25% of the residual net proceeds from a sale of the deBoer companies would be "divided among the management shareholders consisting of [plaintiffs] and such other members of the management team selected by [Denil]." On February 20, 2009, Condon sent a revised version of the buy-sell

10

agreement to Denil and Podvin that incorporated Denil's proposed changes, as well as other changes proposed by plaintiffs.

Defendant Ronald DeBoer reviewed Condon's draft and disagreed with the provision addressing the purchase price of stock using asset valuation methodology (originally proposed by Podvin) and the management incentive provision. On February 24, 2009, plaintiff Denil had a phone conversation with Ronald DeBoer, who expressed his displeasure at the state of the buy-sell agreement, including the management incentive provision and what he perceived as excessive delay in closing the deal. DeBoer did not think it was reasonable for Denil to seek exclusive control over the distribution of 25% of the residual net proceeds of a sale, in addition to an annual salary and a guaranteed 8% return on his shareholdings in the event of a sale. (The parties dispute whether DeBoer told Denil that he was rescinding the deal. Plaintiff alleges that DeBoer told Denil that the deal was off; defendants deny that DeBoer said explicitly that he was rescinding the deal.)

On March 19, 2009, Podvin sent a revised draft of the buy-sell agreement to plaintiffs, Ronald DeBoer and others. Podvin also sent a letter to plaintiffs stating that he had reviewed the draft with DeBoer and asking plaintiffs to "call to discuss" the draft after they had reviewed it. The revised draft incorporated a number of changes that Condon had requested in the February 20 draft. However, the revised draft reinserted the list of managers who would receive the distribution of proceeds, removing the language proposed

11

by plaintiffs that would give power to Denil to determine such managers.  In addition, the revised draft stated that for the purpose of certain future sales, the companies' stock would be valued at "book value."  Ronald DeBoer approved the March 19, 2009 draft before Podvin sent it to plaintiffs.  He believed that stock should be valued at book value so that a shareholder would exit the company on the same valuation terms that he or she entered the company, so as to avoid a windfall.

Plaintiff Denil called Podvin to discuss the March 19 draft and attended a meeting with Podvin in late March.  Denil continued to believe that he should have sole authority to decide which managers would be included in the incentive provision and thought that this provision was an essential part of the proposal and investment plan.  At some point, Podvin suggested to plaintiffs that it might be useful to negotiate directly with Ronald DeBoer and agreed with Denil that a mediator might be useful.   However, DeBoer believed it was unnecessary to involve a third party.  After these initial discussions regarding the March 19 draft of the buy-sell agreement, the parties had no further discussions regarding negotiation of the buy-sell agreement.

F.  <u>deBoer, Inc.'s Termination of Plaintiffs' Employment</u>

In early April 2009, defendant Ronald DeBoer contacted plaintiffs, telling them that he wanted to meet with them to discuss the operations of deBoer, Inc.  On April 13, 2009,

12

plaintiffs attended a meeting with DeBoer and other department managers.  At the meeting, DeBoer criticized plaintiffs' performance in operating the company.  DeBoer told plaintiffs to prepare a plan to improve the management insufficiencies and present it to him on April 15, 2009.  Plaintiffs and DeBoer did not discuss the buy-sell agreement at the meeting.

On April 15, 2009, plaintiffs met with DeBoer and presented a plan and a list of customers and bids from sales staff to address his concerns about operations and the performance of the company.  The parties did not discuss the buy-sell agreement during the April 15, 2009 meeting.

On April 16, 2009, defendant DeBoer called plaintiffs into his office, but did not inform plaintiffs about the purpose of the meeting.  DeBoer terminated plaintiffs' employment during this meeting.  He read from a script, explaining to plaintiffs that they were being terminated because of their failure to purchase stock in the deBoer corporations by the date specified in the stock purchase agreement.  DeBoer informed plaintiffs that he would be keeping their earnest money deposits they provided to defendant corporations.  Defendant deBoer, Inc. paid plaintiffs the payments to which they would have been entitled under their respective employment agreements had they been terminated "with cause."

OPINION

The parties do not dispute that the various agreements are governed by Wisconsin

13

law.  RLI Insurance Co. v. Conseco, Inc., 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.")

### A.  Scope of Plaintiffs' Claims

As an initial matter, the parties dispute the scope of plaintiffs' claims against defendants.  In plaintiffs' motion for partial summary judgment and their brief in opposition to defendants' motion, plaintiffs contend that defendants breached the stock purchase agreement and the duty of good faith not only by failing to use their best efforts to negotiate the buy-sell contract, but by (1) failing to attach certain exhibits to the stock purchase agreement; (2) failing to disclose information about a 2007 traffic accident involving a deBoer Transportation, Inc. truck; (3) failing to obtain plaintiff's written consent before deBoer, Inc. paid a dividend to its shareholders at the end of 2008; and (4) failing to supplement and correct inaccuracies and omissions in the stock purchase agreement.  In response, defendants contend that plaintiff cannot assert breach of contract and other claims arising from these allegations because plaintiffs' amended complaint identified only the buy-sell agreement as a ground for relief and did not provide notice of these additional grounds.

In their amended complaint, plaintiffs allege that defendants "agreed to use their best efforts to cause fulfillment of the conditions precedent" in the stock purchase agreement,

14

including:

> The negotiation, execution and delivery of a Stock Buy-Sell Agreement and Redemption between all Stockholders (including Buyers) and all Companies that contains a mutually agreeable formula to determine a fair market price for stock purchases.

Plaintiffs also allege that defendants obstructed negotiations of the buy-sell agreement and that defendant Ronald DeBoer rescinded the agreement. Under count I, titled "breach of stock purchase agreements," the amended complaint states as follows:

> Defendants prevented Plaintiffs from purchasing stock pursuant to the Stock Purchase Agreements by refusing to negotiate Stock Buy-Sell Agreements and Redemptions and by failing to use their best efforts to cause fulfillment of the conditions precedent to the Plaintiffs' obligations.

Plaintiffs contend that the amended complaint provides notice of the additional claims by alleging that defendants "caused non-fulfillment of the conditions precedent to the obligations of the Plaintiffs." Plaintiffs point out that the conditions precedent to the accrual of their obligations included an agreement to not issue dividends and a representation of the truthfulness and accuracy of the warranties and representations, including defendants' obligation to disclose financial information and potential liabilities.

I agree with defendants that plaintiffs' amended complaint does not provide notice that plaintiffs' claims arise from any circumstances other than defendants' alleged failure to use their best efforts and employ good faith in negotiating the buy-sell agreement. The statement in plaintiffs' amended complaint that defendants "fail[ed] to use their best efforts

15

to cause fulfillment of the conditions precedent to the Plaintiffs' obligations" is akin to saying that "defendants breached the contract by failing to fulfill their obligations pursuant to it." Such a statement is vague, conclusory, capable of encompassing any number of actions or nonactions of defendants and does not "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" as required under federal pleadings rules. E.E.O.C. v. Lee's Log Cabin, Inc., 546 F.3d 438, 443 (7th Cir. 2008) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted)); Conner v. Illinois Department of Natural Resources, 413 F.3d 675, 679 (7th Cir. 2005) (pleading is "vitally important to inform the opposing party of the grounds upon which a claim rests; a complaint is adequate only if it fairly notifies a defendant of matters sought to be litigated") (citations omitted).

If plaintiffs wished to assert additional grounds for relief, they could have sought to amend their complaint or at least clarified the factual grounds for their claims when asked by defendants. In particular, defendants submitted an interrogatory to plaintiffs requiring them to identify the factual basis for their allegation that defendants breached the stock purchase agreement. In plaintiffs' March 29, 2010 response to the interrogatory, they stated only that defendants "failed to use their best efforts to negotiate and execute a Buy-Sell Agreement . . . ."; they said nothing about defendants' failure to perform any other obligations under the agreement. Dkt. #62-9. Although plaintiffs contend that they

16

supplemented their answer to the interrogatory at a later date to include discussion of defendants' additional alleged breaches of the agreement, this supplement was provided on July 22, 2010, after the parties had filed their motions for summary judgment. Dkt. #72-3.

As this court has explained in previous cases, "[s]ummary judgment is not the time to bring new claims into the case" or to change the grounds upon which a claim rests. Felton v. Teel Plastics, Inc., — F.Supp.2d —, 2010 WL 2739832, *9 (W.D. Wis. July 12, 2010) (citing Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002) (plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment")); Wisconsin Interscholastic Athletic Ass'n v. Gannett Co., Inc., — F.Supp.2d —, 2010 WL 2264952, *8 ("A party may not raise a claim at summary judgment if it did not provide notice of the claim in the pleadings as required by Fed. R. Civ. P. 8."). A district courts may reject claims raised for the first time at summary judgment and consider only those claims for which the defendants had proper notice. Clancy v. Office of Foreign Assets Control of United States Department of Treasury, 559 F.3d 595, 606-7 (7th Cir. 2009) (district court may reject claim raised for first time in summary judgment); Lewis v. School Dist. #70, 523 F.3d 730, 741, n.6 (7th Cir. 2008) (same); Lee's Log Cabin, Inc., 546 F.3d at 442-43 (affirming district court's rejection of plaintiff's attempt to substitute AIDS for HIV as factual basis for disability claim under the Americans with Disabilities Act because the change would have been a "major alteration" of the grounds upon which the claim rested

17

and would therefore violate federal pleading rules); <u>Conner</u>, 413 F.3d at 678-79 (affirming district court's decision to strike portion of plaintiff's summary judgment brief that asserted additional grounds for race discrimination claim).

I conclude that plaintiffs' amended complaint provided notice only that their claims were grounded on defendants' obligations to negotiate and execute a buy-sell agreement. Plaintiffs' new allegations would be a "major alteration" of the grounds upon which their claim rested. Accordingly, I will not consider plaintiffs' arguments regarding defendants' alleged failure to satisfy other conditions precedent under the stock purchase agreement.

### B.  <u>Defendants' Breach of the Stock Purchase Agreement</u>

Plaintiffs contend that defendants breached the stock purchase agreement by failing to use their "best efforts" to negotiate the buy-sell agreement. The concept of "best efforts" is related to the concept of "good faith," <u>Metropolitan Ventures, LLC v. GEA Associates</u>, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58, and requires parties to use "reasonable diligence" in the performance of the contract. <u>Gilson v. Rainin Instrument, LLC</u>, 2005 WL 1899471, *5 (W.D. Wis. Aug. 9, 2005) (citing E. Allan Farnsworth, <u>On Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law</u>, 46 U. Pitt. L. Rev. 1, 8 (1984) ("Best efforts is a standard that has diligence as its essence. . . .")); <u>see also</u> <u>Hinc v. Lime-O-Sol Co.</u>, 382 F.3d 716, 721 (7th Cir. 2004) ("Best efforts," as commonly

18

understood, means, at the very least, *some* effort.") (emphasis in original); Black's Law Dictionary 181 (9th ed. 2009) (best efforts requires "[d]iligent attempts to carry out an obligation").

Plaintiffs point to three ways in which defendants failed to use best efforts. First, they say, defendants insisted on provisions in the buy-sell drafts that were "contrary to previous agreements." Plfs.' Br., dkt. #49, at 15. Plaintiffs object specifically to defendants' proposed management incentive and distribution provision that named specific managers who would participate in distribution of 25% of residual net proceeds from a sale of the deBoer companies. From plaintiffs' point of view, it was perfectly clear from the September 5, 2008 proposal that plaintiff Denil should have sole authority to determine which members of the management team would benefit from the 25% incentive provision. Further, because the stock purchase agreement required that the buy-sell agreement distribute proceeds from a sale "in the manner proposed by [Plaintiffs] in their September 5, 2008 proposal," defendants' refusal to concede authority to Denil on this provision was unreasonable and contrary to the stock purchase agreement.

This first argument fails upon review of the proposal. It said nothing about who has the authority to choose which managers would participate in the incentive program or when such decision would be made. Rather, it stated that "select members of the management team" and "Peter [Denil], Jerry [Nardella] and other key managers yet to be defined" would

19

share in the 25%.  In another section, the proposal states that plaintiffs "currently . . . would anticipate that the management team would consist of Pete [Denil], Jerry [Nardella], Dale [DeBoer], Doug [Vogel], Dave [Anderson], Roger [Placzek], Kay [DeBoer] and possibly the director of safety."  The proposal did not state that plaintiff Denil had the authority to "select members of the management team" or define "other key managers."  In other words, the proposal left open the questions of how and when the managers would be defined and did not preclude defendants from negotiating about who would share in the 25% proceeds. A reasonable jury could not conclude that defendants' proposal of a list of particular managers violated defendants' obligation to use their "best efforts" to negotiate.  In fact, the list proposed by defendants was similar to the list of persons who plaintiffs anticipated would be on the management team in the September 5 proposal.

Plaintiffs' next argument is that defendants failed to use their best efforts by employing "regressive, harsh and unreasonable negotiation tactics."  Plfs.' Br., dkt. #49, at 15, 19. This particular accusation arises out of defendants' decision to modify the provision in the draft of the buy-sell agreement regarding the valuation method that would be used to set the price of the deBoer companies' stock for certain future sales.  The first two drafts of the buy-sell agreement incorporated an EBITDA valuation method, the third draft used a asset appraisal method and the fourth draft proposed a valuation method based on book value.  Plaintiffs agreed to both the EBITDA method and the asset appraisal method, but

20

they contend that defendants' inclusion of the book method in the fourth draft was "regressive" and contrary to the proposal. Plaintiffs do not explain why it was necessarily "regressive" for defendants to propose the book value method or whether there was something wrong with the book value method. Plaintiffs knew that defendant Ronald DeBoer disapproved of the EBITDA valuation method and would be unlikely to accept a provision incorporating that method. Although it would have been helpful if Podvin had sought DeBoer's approval before proposing the asset valuation method so as to avoid the necessity of changing it later, the fact that defendants proposed an alteration to a previous draft of the agreement is not sufficient evidence to conclude that they failed to use their "best efforts."

In addition, plaintiffs' argument that the book valuation method was contrary to the proposal has no merit. The stock purchase agreement required only that the buy-sell agreement contain "a mutually agreement formula to determine a fair market price for stock purchases." It did not require the buy-sell agreement to incorporate any valuation method contained in the proposal. In any event, the proposal discussed an EBITDA valuation method only for "example purposes" and assumed that the parties would "discuss the best way to value an organization" at a later date.

Plaintiffs' final argument is that defendants failed to use their best efforts to negotiate the buy-sell agreement by rescinding the agreement and ceasing meaningful negotiations after

21

the phone call between plaintiff Denil and defendant Ronald DeBoer on February 24, 2009. The parties dispute whether DeBoer told Denil that the deal was "off." Regardless what was said in the February 24 phone conversation, it is undisputed that defendants proposed a fourth draft of the buy-sell agreement on March 19, 2009, approved by Ronald DeBoer, and that it incorporated several of the plaintiffs' proposed changes to the previous draft. Podvin asked plaintiffs to "call to discuss" after they had an opportunity to review the proposal. It is true that defendants did not incorporate plaintiffs' proposal that Denil be given sole authority to determine which members of the deBoer companies' management team would benefit from an incentive provision. However, the deBoer companies' duty to negotiate diligently and in good faith did not require them to concede this point to plaintiff Denil. Thus, although plaintiffs objected to specific provisions in the draft, the fourth draft shows that defendants were still open to negotiation regarding the buy-sell agreement. Plaintiffs met with Podvin to discuss the management incentive provision, but proposed no specific changes to the fourth draft. Plaintiff Denil proposed to Ronald DeBoer that they meet with a third party, but DeBoer declined. Plaintiffs have cited no cases, nor have I found any, suggesting that the duty to negotiate diligently requires involving a mediator. The record suggests that neither party was willing to acquiesce to the other parties' position regarding the management provision and that after they realized this, neither party attempted to negotiate the agreement further.

22

In sum, plaintiffs have not adduced sufficient evidence for a reasonable jury to conclude that defendants failed to use their best efforts to negotiate the buy-sell agreement. Instead, the evidence shows that although defendants acted diligently, negotiations failed because the parties could not agree on the incentive provision. Therefore, I will deny plaintiffs' motion for summary judgment and grant defendants' motion with respect to this claim.

### C. Breach of Good Faith and Fair Dealing

Plaintiffs contend that defendants breached the covenant of good faith and fair dealing by refusing to negotiate the buy-sell agreement. The covenant of good faith and fair dealing implied in every contract, Metropolitan Ventures, LLC, 2006 WI 71, ¶ 35, requires parties to be cooperative in attempting to fulfill the terms of the contract, id., and "is intended as a guarantee against arbitrary or unreasonable conduct by a party." Foseid v. State Bank of Cross Plains, 197 Wis. 2d 772, 796, 541 N.W.2d 203, 213 (Ct. App. 1995) (citations omitted).

Plaintiffs' claim that defendants violated the covenant of good faith arises out of the same allegations as their claim that defendants failed to use their best efforts. In particular, plaintiffs contend that defendants took negotiating stances contrary to previous agreements and reneged on provisions to which they had already agreed, utilized regressive negotiation

23

tactics, communicated an intent to terminate negotiations and rescind the deal and refused to communicate and cooperate with plaintiffs regarding the buy-sell agreement. In concluding above that defendants did not breach their obligation to use their best efforts to negotiate the buy-sell agreement, I have necessarily concluded that defendants acted in good faith in negotiating with plaintiffs. Metropolitan Ventures, LLC, 2006 WI 71, ¶ 35 ("[W]hen a contract requires that a party use its "best efforts" to fulfill its contractual obligations, the notion of 'best efforts' incorporates the concept of good faith."); see also Gilson, 2005 WL 1899471, *5 ("Compliance with the 'best efforts' standard requires good faith plus diligence."). Therefore, defendants' motion for summary judgment on this claim will be granted and plaintiffs' will be denied.

### D.  Breach of Employment Agreements

Plaintiffs contend that defendant deBoer, Inc. breached their respective employment agreements by terminating their employment "without cause" and by failing to provide the benefits required under the employment agreements upon a termination "without cause."

Section 12(a)(v) of plaintiffs' employment agreement granted defendant deBoer, Inc. the right to terminate plaintiffs' employment "with cause" for the "[f]ailure of [plaintiffs] to purchase stock pursuant to [the] Stock Purchase Agreement signed simultaneously with this Agreement." Dkt. ##41-11, 41-12. It is undisputed that plaintiffs did not purchase stock

24

pursuant to the stock purchase agreement on or before the closing date of April 15, 2009 and that deBoer, Inc. terminated plaintiffs' employment on the explicit grounds that plaintiffs had not purchased stock pursuant to the stock purchase agreement.

Plaintiffs contend, however, that defendants must prove that plaintiffs *breached* the stock purchase agreement to show a "[f]ailure . . . to purchase stock pursuant to [the] Stock Purchase Agreement."  Further, plaintiffs argue, defendants cannot establish that plaintiffs breached the agreement because they were not obligated to perform under the agreement until defendants had satisfied the conditions precedent to plaintiffs' obligations under the stock purchase agreement.  Plaintiffs cite <u>Woodland Realty, Inc. v. Winzenried</u>, 82 Wis. 2d 218, 224, 262 N.W.2d 106, 109 (1978), which explains that, under the general rule of contract law, "a condition precedent must be exactly fulfilled or no liability can arise on the promise which such condition qualifies."  (Internal citation and quotation omitted).

I am not persuaded that defendant deBoer, Inc. had to establish that plaintiffs breached the stock purchase agreement before it could terminate plaintiffs under section 12(a)(v) of plaintiffs' employment agreement.  First, unlike <u>Woodland Realty</u>, this is not a case in which defendants have sued plaintiffs for breach of contract and plaintiffs are asserting defendants' failure to fulfill conditions precedent as a defense.  In this case, defendants terminated plaintiffs' employment pursuant to a *separate agreement* that does not mention conditions precedent or require defendants to establish a breach.

25

The plain language of the employment agreement states that defendants may terminate plaintiffs for "failure" to purchase stock, with no requirement that defendants show that plaintiffs breached a separate stock purchase agreement.  The parties could have required that defendants establish a "breach" before terminating plaintiffs if that was what they had intended.  For example, § 12(a)(iii) of the employment contract states that deBoer, Inc. can terminate plaintiffs' employment "with cause" for "[t]he *breach* by the Employee of any provisions of paragraph 8 or paragraph 9 of this Agreement [concerning noncompetition and confidentiality]."  This language shows that the parties knew how to draft language requiring the establishment of a breach.  The parties did not use such language in § 12(a)(v). Thus, under the plain language of the employment agreement, defendants were within their right to terminate plaintiffs' employment.

This interpretation of the employment agreements makes sense in light of the parties' relationship and the purpose of the employment relationship.  Plaintiffs admit that they were not hired simply because deBoer, Inc. was looking for new employees.  Plaintiffs were hired to fulfill the September 5, 2008 "Proposal for Management Change *and Investment,*" (emphasis added).  A significant part of this plan was plaintiffs' investment in the companies. Thus, defendants reserved the right to terminate plaintiffs' employment "with cause" if plaintiffs did not purchase stock, likely to protect the companies from situations such as this, in which the parties use their best efforts to negotiate in good faith but are unable to agree

26

to the terms of a buy-sell agreement.

There might be a situation in which plaintiff could prove a claim for breach of the employment agreement if defendant had terminated them for failure to buy stock but defendants acted purposefully to prevent them from buying stock. In fact, plaintiffs assert this argument, contending that they were "ready, willing and able to purchase the stock," but defendants' failure to perform the conditions precedent prevented plaintiffs from doing so. Plfs.' Br, dkt. #39, at 33. However, plaintiffs have not adduced sufficient evidence to support a finding that defendants' actions prevented them from purchasing stock. I concluded above that defendants used good faith and their best efforts to negotiate a buy-sell agreement. To the extent plaintiffs are alleging that defendants failed to fulfill other conditions precedent, such as failing to attach exhibits to the agreement, failing to disclose information about the 2007 traffic accident or failing to obtain plaintiffs' written consent before paying a dividend to its shareholders, plaintiffs did not include such allegations in their amended complaint. Even if those allegations were properly before the court and plaintiff could prove that defendants failed to provide financial information or issued a dividend without permission, plaintiffs' claim would still fail because plaintiffs adduced no evidence showing that defendants' failure to fulfill those conditions had any effect on plaintiffs' ability to purchase stock. For example, plaintiffs admit they did not discover that defendants issued a dividend until after plaintiffs were terminated and as a result of this

27

lawsuit.  Dkt. #76, ¶ 36.  Thus, defendants' issuance of a dividend was not an action that prevented plaintiffs from purchasing stock.  In addition, plaintiffs admit that

> the reason why [they] are not currently employed at deBoer, Inc. is simple—Defendants breached the Stock Purchase Agreement.  Ron decided he did not want to negotiate and consummate the Buy-Sell Agreement and, accordingly, used his own acts of obstruction as alleged justification for terminating Plaintiffs' employment.

Plfs.' Br., dkt. #39, at 16.  In sum, plaintiffs have not shown that anything defendants did or did not do prevented them from purchasing stock.  It was the breakdown of negotiations regarding the buy-sell agreement that prevented plaintiffs from buying stock and gave defendant deBoer, Inc. cause to terminate plaintiffs' employment.  Therefore, under the plain language of plaintiffs' employment agreements, deBoer, Inc. terminated plaintiffs' employment "with cause" and was not required to provide the compensation that would have been due plaintiffs under the provision in their employment agreements for compensation if they had been terminated without cause.  Because plaintiffs received the payments due them, I will grant defendants' motion for summary judgment and deny plaintiffs' motion with respect to this claim.


### E.  Tortious Interference by Defendant Ronald DeBoer

Plaintiffs' final claim is that defendant Ronald DeBoer tortiously interfered with deBoer, Inc's performance of plaintiffs' employment agreements by "inducing or otherwise

causing deBoer, Inc. to not perform or fulfill its contractual obligations" under those agreements.  Plfs.' Amd. Cpt., dkt. #18, ¶ 28.  To establish a claim for tortious interference with another's performance of a contract under Wisconsin law, a plaintiff must establish that (1) the plaintiff had a contract with a third party; (2) the defendant interfered with that contract; (3) the defendant's interference was intentional; (4) the interference caused damages to the plaintiff; and (5) it was not justified or privileged.  Briesemeister v. Lehner, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531.

Plaintiffs can prevail on their tortious interference claim only if they establish that defendants breached the employment agreements or that defendant Ronald DeBoer interfered with some specific right of plaintiffs that is related to the agreement, such as interfering in a way that reduced plaintiffs' benefits under the agreement.  Sampson Investments by Sampson v. Jondex Corp., 176 Wis. 2d 55, 73, 499 N.W.2d 177, 184 (1993) ("[W]here there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with.").  I concluded above that defendant deBoer, Inc. did not breach the employment agreements by terminating plaintiffs' employment under § 12(a)(v) of the agreements and that defendants did not prevent plaintiffs from purchasing stock under the stock purchase agreement.  In other words, deBoer, Inc. and Ronald DeBoer acted in a manner expressly permitted by the contract in terminating plaintiffs.  Thus, Ronald DeBoer

is not liable for tortious interference and defendants' motion for summary judgment on this claim will be granted.

### F.  Defendants' Counterclaims

Plaintiffs seek summary judgment on defendants' counterclaims that (1) plaintiffs breached the stock purchase agreement by failing to use their best efforts to negotiate the buy-sell agreement with the deBoer companies; and (2) plaintiffs breached the duty of good faith and fair dealing owed to defendants.

Under the stock purchase agreement, "all parties agree[d] to use their best efforts to cause fulfillment of the conditions precedent," including the negotiation, execution and delivery of a stock buy-sell agreement.  Dkt. #41-13, §§ 5.02, 6.05(c).  Defendants contend that plaintiffs failed to negotiate reasonably by insisting that the EBITDA valuation method be used in the buy-sell agreement, by failing to respond to the deBoer companies' final draft of the buy-sell agreement and by demanding that plaintiff Denil have sole authority to determine which members of the management team would receive 25% of the residual net proceeds from a sale of the deBoer companies.

A reasonable jury could not conclude that plaintiffs failed to use their best efforts or negotiated in bad faith.  With respect to the valuation method, the evidence shows that plaintiffs were willing to negotiate this provision and in fact accepted defendants' proposal

for an asset valuation method.  In addition, there is no evidence that plaintiffs refused to consider the book value method that defendants proposed later.  Similarly, the evidence does not show that plaintiffs failed to respond to the fourth draft of the buy-sell agreement. Instead, the record shows that plaintiffs contacted defendants' lawyer to discuss their disagreements related to the management incentive provision and proposed involving a third-party mediator.  Finally, a jury could not conclude that plaintiffs' insistence that plaintiff Denil have control over the management distribution provision amounted to "bad faith" or a failure to use best efforts.  As defendants admit, plaintiffs' September 5, 2008 proposal did not specify who would have this authority.  However, plaintiffs believed that Denil needed this authority in order to carry out their plan to transition the deBoer companies from asset-heavy to asset-light trucking companies.  Defendants had similarly strong feelings on the issue.  Neither side was willing to compromise the provision and the parties reached an impasse.  The duty to apply one's best efforts and negotiate in good faith does not require that parties concede particular provisions they believe to be essential to the bargain.  The evidence before the court suggests that both sides of the proposed transaction satisfied the best efforts requirement and negotiated in good faith, but failed to reach an agreement. Therefore, plaintiffs' motion for summary judgment on defendants' counterclaims will be granted.

31

ORDER

IT IS ORDERED that

1.  The motion for summary judgment, dkt. #32, filed by defendants deBoer, Inc., deBoer Transportation Inc., deBoer Capital Associates Inc. and Ronald DeBoer is GRANTED.

2.  The motion for partial summary judgment, dkt. #38, filed by plaintiffs Peter Denil and Gerald Nardella is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to defendants' counterclaims for breach of contract and breach of the covenant of good faith and fair dealing.  The motion is DENIED in all other respects.

3.   Defendants' motion to exclude expert testimony, dkt. #82, is DENIED as unnecessary.

4.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 22d day of September, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

32