
CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-3278 & 10-3475

PETER DENIL and GERALD NARDELLA,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*

DEBOER, INC., *et al.*,

*Defendants-Appellees,*
*Cross-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 09-cv-470-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED APRIL 1, 2011—DECIDED MAY 13, 2011

Before EASTERBROOK, *Chief Judge*, and BAUER and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Ronald DeBoer started a trucking business, deBoer Transportation, in 1967. He and other members of his family managed it for 40 years, but by 2007 he wanted to sell the business and retire.

(There were then three affiliated firms: deBoer, Inc.; deBoer Transportation Inc.; and deBoer Capital Associates Inc.; we refer to them collectively as deBoer.) After one potential sale fell through, Peter Denil and Gerald Nardella proposed to take over management of the business and prepare it for sale to an outside investor within five years. Ronald DeBoer was receptive. The parties signed two contracts and negotiated toward a third.

The first contract was an employment agreement. It made Denil the CEO of deBoer and Nardella the executive vice president of operations. This contract took effect in October 2008; Denil and Nardella assumed their positions immediately. deBoer held the right to discharge Denil and Nardella with or without cause, but if the discharge was without cause they were entitled to extra payments.

The second contract, a stock-purchase agreement that also was signed in October 2008, called for Denil to buy 4% of deBoer's stock for $500,000, and for Nardella to buy 2% for $250,000. The closing date was April 15, 2009, or whenever the third contract was signed, if earlier. The parties agreed that failure to purchase the stock by April 15, 2009, would be "cause" for terminating Denil's and Nardella's employment. They also agreed that the signing of the third contract—a buy-sell agreement, common when outsiders acquire shares of family firms or other closely held businesses—would be a condition precedent to the obligation to purchase the 4% and 2% interests. The stock-purchase contract contained a clause in which the parties promised to use their best efforts to conclude the buy-sell contract.

The buy-sell contract was never signed, however. The goal of this negotiation was to agree on how the purchase price would be allocated if deBoer could be sold to an outside buyer. The parties agreed that all equity investors would receive the price they had paid for their shares, plus interest, and that 75% of any surplus would be distributed to the investors according to share ownership. The remaining 25% of any surplus was to go to members of the management team. But which members, and how much to each? That proved to be the sticking point. Ronald DeBoer wanted a schedule; Denil and Nardella, however, insisted that Denil have sole discretion to decide who received how much from this surplus pool. Ronald DeBoer worried that Denil would use this authority to direct the whole amount to himself and Nardella, even though they would own only 6% of the stock. There were some other open issues, but we need not discuss them.

When April 15, 2009, arrived and the negotiations for the buy-sell contract remained stalled, Denil and Nardella might have purchased their 4% and 2% interests anyway, and thus secured their positions, or they might have tendered the $750,000 into an escrow. They took neither step, and deBoer fired them, paying the benefits that the employment contract specified for a termination with cause. They replied with this suit under the diversity jurisdiction, seeking reinstatement (or at least the benefits for termination without cause), the opportunity to invest in deBoer, and damages for what they call Ronald DeBoer's tortious interference with the two completed contracts. deBoer filed a counterclaim, seeking

damages for the cost of issuing, and then undoing, a dividend that the firm had paid in anticipation of the $750,000 investment. Wisconsin law controls. The district court granted summary judgment and dismissed the suit, rejecting both sides' claims. 2010 U.S. Dist. LEXIS 99404 (W.D. Wis. Sept. 22, 2010).

Plaintiffs' principal contention is that deBoer did not fulfil its promise to use "best efforts" to reach agreement on a buy-sell contract. Had this contract been signed, plaintiffs insist, they would have purchased their shares by April 15, 2009, and would today be both investors and managers. One difficulty with this argument is that plaintiffs treat the best-efforts clause as a form of agreement to agree, which deBoer violated by not acceding to their position. Yet agreements to agree are not enforceable in Wisconsin. *Dunlop v. Laitsch*, 16 Wis. 2d 36, 113 N.W.2d 551 (1962); see also *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810 (7th Cir. 1987) (an "agreement in principle" is not enforceable in Wisconsin; only a completed contract containing essential specifics is binding).

A best-efforts clause usually requires one party to make appropriate investments for another's benefit—for example, a distributor bound to use best efforts to promote a line of products must advertise them, hawk them to retailers, and so on. This is not at all what "best efforts" means when it comes to negotiation. *Metropolitan Ventures, LLC v. GEA Associates*, 291 Wis. 2d 393, 717 N.W.2d 58 (2006), held that a promise to use "best efforts" to persuade another party to adhere to a partnership agreement was satisfied by earnest requests; it

did not require one side to sacrifice its own interests in the process.

If the best efforts undertaking is not an agreement to agree, what might it be? The contract does not define the phrase, and the parties themselves may not have had any clear idea; they have not proffered any communications exchanged during the negotiations. Maybe they were thinking along the lines of a duty that labor and management have under federal labor law: to engage in good-faith bargaining toward a contract with respect to those issues that employers must discuss with unions. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981). This duty requires an exchange of proposals and obliges each side to consider the other's requests seriously, and to compromise when possible, but it does not compel either side to accept the other's proposals. *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608 (1986). If that's the meaning of this "best efforts" clause, then both sides performed as required. They exchanged many proposals, suggested amendments, made counterproposals, and so on; the negotiations lasted for six months. The fact that one final disagreement—how to divide 25% of any surplus on sale of the business—could not be bridged does not imply that either side failed to bargain in good faith. deBoer did not have to accept plaintiffs' final proposal, any more than plaintiffs had to accept deBoer's.

Like the district court, we conclude that neither side violated the best-efforts clause of the stock purchase agreement. This, plus the absence of a signed buy-sell

agreement, means that the stock-purchase agreement did not require plaintiffs to buy 6% of deBoer's stock. Plaintiffs say that it *also* means that they were entitled to keep their managerial jobs, or at least be paid the compensation due when fired without cause. Yet the employment contract does not contain the same condition precedent as the stock-purchase contract. The employment contract made plaintiffs' managerial positions contingent on their buying stock no later than April 15, 2009. They were free to buy the stock, with or without a buy-sell agreement; they just chose not to do so. They agreed that they could be let go for cause if they did not pay up by April 15, 2009. Having chosen not to pay, they can't complain about the termination of their managerial positions. Ronald DeBoer wanted to ensure that the new managers' interests were aligned with those of other shareholders. Plaintiffs were not entitled to retain their positions without making the investment essential to that end.

Arguments about tortious interference with contract are pointless. No one "interfered" with any contract; deBoer simply enforced the contracts it had negotiated. Plaintiffs devote a lot of space to arguing that defendants did not act in good faith, by which they mean that deBoer took full advantage of its rights under the contracts. It was entitled to do that. "Good faith" in contract law means honesty plus refraining from opportunistic conduct that exploits the other side's sunk costs. See *Market Street Associates L.P. v. Frey*, 941 F.2d 588 (7th Cir. 1991); *Continental Bank, N.A. v. Everett*, 964 F.2d 701 (7th Cir. 1992); *PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d

969 (7th Cir. 1994); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 96 F.3d 275 (7th Cir. 1996). An actor who sulks in his dressing room mid-way through the production of a movie is behaving opportunistically, because the producer has spent a great deal on the film and does not want to start over with a new actor. deBoer did not take advantage of plaintiffs' sunk costs; instead, plaintiffs volunteered to start working at deBoer knowing that the buy-sell contract had not been signed. They could have protected themselves by waiting, and they can't use their own decision as the springboard for insisting that deBoer capitulate to their contractual proposals.

We're mystified by plaintiffs' arguments about the dividend and their contention that deBoer failed to turn over all financial information. If plaintiffs were saying that the dividend diluted the value of their (potential) 6% interest, so that they should not be required to buy the stock, they might have a point; likewise if they argued that the financial information made the stock purchase less attractive. But plaintiffs have not argued that these events excuse them from performing; instead they still wanted to become investors. The dividend and belated disclosure do not support the kind of relief that plaintiffs seek.

As for the cross-appeal: deBoer jumped the gun by distributing the dividend before plaintiffs had made their investment. People who count their chickens before they hatch have only themselves to blame. The stock-purchase agreement entitled Denil and Nardella to

postpone their investment until after a buy-sell agreement was in place. When deBoer balked at plaintiffs' proposals for the buy-sell agreement, they were entitled to walk away without investing. They did not violate any of deBoer's rights by doing so (and, as we have observed already, plaintiffs were as free to reject Ronald DeBoer's proposals for the buy-sell agreement as he was to reject theirs). Nothing in the stock-purchase agreement requires Denil and Nardella to compensate deBoer for expenses incurred in anticipation of a $750,000 investment or in returning to the *status quo ante* if the investment did not occur. The cross-appeal strikes us as nothing but an excuse to file a sur-reply brief to have the last word. If we had been asked, we would have dismissed the cross-appeal and rejected the extra brief before the judges had been forced to waste time reading it. See *Aventis Pharma S.A. v. Hospira, Inc.*, 2011 U.S. App. LEXIS 6020 (Fed. Cir. Mar. 24, 2011).

                      AFFIRMED